Good morning. Good morning. My name is Peter Smith and I represent the plaintiff Anna Smith. Who's your wife? That is correct, Your Honor. I would like to reserve two minutes to rebuttal. All right. Anna is my wife. She's also a neonatal intensive care nurse. She's a mother. And ten years ago, Anna's government began a dragnet collection of her call records. Those call records reveal detailed information about Anna when analyzed in the aggregate. How do we know whether those records were A, number one, ever seized and B, actually searched? Your Honor, I think the government's own declarations establish that they are collecting the records from Verizon Wireless. Well, the records I saw established from Verizon Business Services. Can you point me where in the record the government acknowledges that records were obtained from Verizon Wireless? Certainly, Your Honor. Certainly. In the declaration of Ms. Shea for the NSA, she talks about collection of data that's aggregated over multiple telecommunication service providers. Now, Verizon Wireless is very likely one of those providers. Okay. So that's speculation number one, that it actually included Verizon Wireless. Is that correct? It's not necessarily speculation, but that's what the record reflects, that they're collecting it over. Well, Ms. Shea, I read her declaration pretty carefully. And as you would expect from someone from the NSA, she was very careful about what she said and what she didn't say. And I didn't see Verizon Wireless listed in her declaration. You're correct, Your Honor. They identify no service providers. Okay. So we're going to assume that because Verizon Wireless is a major carrier that it included records of Verizon Wireless. Well, I think you can make that assumption. Or you can say that because they state they're collecting the records across multiple telecommunication providers, that Anna's records are certainly being swept up in the records of others. Where in the record do I find that they have seized all of the records of Verizon Wireless? You will not find that in the record. In fact, you will not find it. That's the second speculation, that every telephone call for the last, what, seven years, from every phone carrier in the United States has been seized, including your wife's records. Your Honor, we're not saying that every phone call has ever been tracked or the call record ever been collected. What we're saying is it's very likely at this point in the proceeding that Anna's records have been swept up in this program. Let me just maybe short circuit this and tell me if I'm wrong. But I thought in one of the briefs I read that, well, we know that Verizon Business, because there was some public disclosure of that, and that her counsel at the time, at some point, was the ACLU or co-counsel. Today, her counsel is the ACLU co-counsel. Who is a Verizon Business subscriber. Correct, Your Honor. So is that basically what we have to determine standing on is whether the fact that there has been this sweep on Verizon Business records, at least for, I think, a 90-day period, was acknowledged that she falls in that category? I think that's one factor, Your Honor, but there are other factors as well. And I think if you look at the declaration and the other declaration by the government in this case, you will see that they are asserting this program is effective. And the reason that it's effective is because they're collecting a large block of data. So they can do what they call the social chaining or the connections between people. And they do that across telecommunications providers. And that's exactly what Ms. Shea's declaration states. If Anna were to make calls solely to Verizon Wireless, and Verizon Wireless were not one of the providers that was being swept up in this program, then her records would not be a part of it. However, she makes calls to a number of different providers. And at some point, one of those providers is very likely part of the program, or the government doesn't have an effective program like they say they do. So quite simply, standing is established by the declarations of the government. So is your claim of injury the mere taking of the record? That is correct. The collection of the record is where the constitutional violation takes place. You're not really going to the second point about the data query so much as your point is the mere collection of the metadata is a search in your view, correct? That is correct. There is the collection. There is also a secondary search when the data is queried by the government. Okay. And how do we know that her records were queried? We do not. However, we do know that in a query, the way the query system necessarily works, it has to scan the entire database. So is your position then that the injury occurs from the scan of the entire database or from the scan of her phone number? It would be the scan of the entire. We have no evidence to suggest that Anna's number has ever been a seed in the querying process. So where is the injury that she has personally sustained? The injury is in the collection of the data. Okay. So may I then just try to get a procedural point straight? You were in the district court asking for a preliminary injunction, correct? Correct. And that's where we got Ms. Shea's declaration and one from Ms. Smith and then an expert. In your view, are those documents also something we can look at in connection with the motion to dismiss? You're correct. They can. So in effect, is the motion to dismiss converted to a summary judgment because we have the statements of your expert and the statements of Ms. Shea and I believe somebody else about how the data program works? You know, the district court didn't address that issue. But we have to. In support of the motion to dismiss, the government did file a declaration in support of that, which could convert that into a motion for summary judgment and the standard would be slightly different under a summary judgment. Right. However, under any standard that applies in this case, I believe there's been a violation of the Fourth Amendment. And what the government does in this case is relies on Smith v. Maryland from 1979. Okay. So before we get to Smith, I just want to – so really your position is that with the addition of these affidavits, both from your side and the government side, that in effect the case is ripe for determination on a legal basis. Is that right? And that is correct. And the reason it's ripe is because the cases that the government cites in support of this program, Smith v. Maryland, and cases that come after it, simply do not address the issue that we're facing here. I'm sorry, doesn't address what? Doesn't address the issue we're facing here, the factual situation we're dealing with here. Here we're dealing with a dragnet collection of call records. Starting as long as 10 years ago, every single day, Anna's call records were obtained by the government and put in a database. Those call records are retained for a five-year period. Smith v. Maryland involved a single criminal defendant where a pen register was put on the phone company's routing system for a period of three days. Anna is not a criminal defendant. She's not suspected of any crime. However, her records are being swept up. So Smith v. Maryland is very different, and the cases that come after it are very different. And I think if you look at knots, the United States Supreme Court stated that dragnet collection and surveillance is very different. And as we move forward in time, you can see the Supreme Court was very wary of dragnet collection. In Jones, it suggested that daily collection of a person's whereabouts by GPS violated the Fourth Amendment. And then we have the more recent case of Riley. Jones didn't. It was pretty focused and pretty personal, wasn't it? Correct. I mean, this was a specific tracking device put on Mr. Jones' vehicle that enabled law enforcement to know exactly where he was at any moment of the day, right? That is correct. They did put a GPS tracker. In that case, we don't cite to it for the premise that it controls in this particular matter. It's a very different case. It involves the movements of a person. What it does address, however, is that technology matters in the 21st century. It does, but it's an odd case in that, as I recall, it was decided on a trespass basis and not a Fourth Amendment basis, although you have concurring opinions that speak to what you're talking about. But I'm having some trouble figuring out how Jones gets anybody anywhere because it's on a trespass basis. I think it's on the general principle, Your Honor, the principle that in the 21st century we need to look at the Fourth Amendment with a long view and look at what is actually being examined or collected by the government. And then we fall back to cats, essentially. Is there a reasonable expectation of privacy in the call records that are being collected about Anna every single day? And I think the record reflects that the information the government is obtaining about Anna on a daily basis is revealing. I think at one point the administration described a proposed fix where the carriers would be required to retain this information over a period of time and when the government felt the need to cross-check information, they would get warrant authorization from the FISA court or something like that. Do you see a problem with that? That's not the issue before the court. However, it depends on the nature of the law and what exactly the standard is to go collect this data and how broad they can actually, under that program, go. But it would be a very different question. How is that different from this case? In this case, they're collecting all the data and putting it into a database without reasonable suspicion of anyone. And they're keeping that data for a period of five years so they can search it later. This is a search without suspicion. I thought the statute called for reasonably articulable suspicion. When they query the database, it does require that. And that's the minimization procedures the government talks a lot about. So they're getting this data under the business records, basically, of the telecom companies, correct? It is a record that's retained by Verizon Wireless. That is correct. And you really – there seems to me there's two aspects to it we need to look at. One is the nature of the data in and of itself, and then the second is the volume and time. So my first question really goes to the data itself that people know that the phone company collects, which is really, isn't all the data that we're talking about what I would call transactional data? It's not content? Well, when viewed in isolation, perhaps, but when it's aggregated over time, it does reveal a great deal about a person's affiliations, who they're talking to. And I want to just address just specifically what the data is. It's numbers dialed. Right. Numbers dialed in, duration of call, and time of day. Right. And there's some other data that's being collected as well. However, that information, when aggregated over time, as Professor Felton testifies to in his declaration, can reveal a lot about a person. They can see who you call and how frequently and how long you talk to them, the hour, the time of day you call them. It can reveal relationships. It can reveal political affiliations. But you keep going to the second stage, and we're trying to focus on the first stage, which is what is it that is constitutionally significant about the data that is being collected today versus the data that the Supreme Court approved in Smith v. Maryland? It appears to me that it's the same data. And I think that is correct, Your Honor. It is the same data. So if that's the case, then why is Smith still not controlling? Because it talks about no legitimate expectation of privacy in the phone numbers that you dial or the calls you receive. Two points. Smith collected slightly different data, and I want the Court to recognize that. It was only phone numbers dialed. It wasn't the other aspects of the program as well. So it is slightly different in the data that's collected. And metadata hasn't changed over time, but the ability to analyze metadata when collected about one person over a long period of time. Okay, but that's what I'll call step two. I'm still trying to focus on step one here, which is what is it about the factual data that is being collected that takes us out of the purview of Smith v. Maryland? It's the scope of the program and the amount of data that they're collecting. So then it goes not to the nature of the data but the amount, right? It goes back to Katz and whether Anna has a reasonable expectation of privacy in this information because of what it reveals. Okay, so let me just break it down. We have the originating phone number, the terminating, the length, the duration, a couple of these identifiers that can tell you which equipment and which user. If the government went to Verizon and said, I'd like this information for three days on everyone in the United States, would that be a Fourth Amendment violation? For three days? Yes. I think it would be. It would be? Yes. Would it be a violation for one day? Yes. Would it be a violation, in other words, this data, which I thought you told us really is basically the same as Smith. You're now saying it's different than Smith. Well, I'm saying that the metadata hasn't changed. The phone numbers haven't changed. They're still exactly the same, correct? What I'm saying is that when you aggregate this data, if they were to collect all the data about every person in the United States for one day. Of course, with this case, I probably overspoke, so to speak, because this case is only about Ms. Smith. Correct. So if they only ask for Ms. Smith's data, is it a violation? Under Smith v. Maryland, if that case was decided correctly and that's what the court will apply going forward, then yes. It would not be a violation. Would not be a violation. Correct. And now it becomes a violation because, and then you take it. Yes, there's some line between Smith v. Maryland and what we are today. Today we have Dragnet every single day. Last night they downloaded the call records. Tonight they'll download the call records and they keep them for five years. The aggregation of that data, and I just want to focus just on Anna for just one minute. On just Anna, that information, when stored over a long period of time, reveals a great deal about her. Now when you combine that with everybody else's information, when you can do the hops and the connections, you can see that Anna called her mother, perhaps, and then her mother called a doctor. Or you can see that her mother. But in order to do that, I need reasonable suspicion. I, meaning if I were the government, I would need reasonable suspicion to query her data, correct? That's the second step of the process. And those are the minimization procedures. We're asserting the actual collection of that data. Once the government has it, the violation has occurred. Okay, so if it's, that's where I'm having some confusion with the other question you answered. Because if it stays with the phone company, and then the government doesn't ask for it until it has some reasonable suspicion of a terrorist connection with X, presumably not Ms. Smith, that's a different issue. But if it stays with the phone company, there's no problem, is that right? In that particular case, if it stayed with the phone company, there would be some reasonable articulable suspicion about the seed before they even asked for the data. And does a phone subscriber have a reasonable expectation in privacy of this transactional data if it's left solely with the phone company? As to the phone company and the customer be governed by the privacy policy, as to the government, they most certainly do. I don't think, the really difficult issue in this case is we've never seen But if the privacy policy permits the phone company to provide it to the government, then aren't you in a circular? No, I think there's still a reasonable expectation of privacy. The government will not obtain all of your data. Is the privacy policy of Verizon Wireless or Verizon Business part of our record? It is not. Okay. But getting back, I see my time is dwindling. Actually, you're kind of way over. Why don't you sum up, and then we'll hear from the government. To sum up, Your Honor, this case presents a very unique question to the court, one that I don't think has ever been seen before, and that's the dragnet collection of call records that can reveal a lot about an individual. I would ask the district court to be reversed and remanded for entry of injunction. Can I just ask one quick question? You acknowledge that Smith v. Maryland holds what it holds, that there's no expectation of privacy as a general matter in this kind of information. Is that right? In the context of Smith v. Maryland, in the limited facts that it addressed, not a dragnet situation, Smith v. Maryland, I'm not asking this court to overturn it.  We know our place. Sometimes. Your argument is that because of duration and volume, this is a very different case. Is that right? Correct. This is dragnet collection. Thank you. Thank you. You can go home and tell Anna you did it. Oh, she's here today, Your Honor. Oh, she is? Yes. Your guy did a nice job. We'll hear from Mr. Byron. Thank you, Your Honor. I think the last time we saw you, Mr. Byron, we were at a movie. Right. Citizen Four. Is that right, Your Honor? And right in the middle of it, to our astonishment, there we were in this very courtroom with you. I think you may have had a red pep deal. And I haven't seen the movie, Your Honor, though I've heard the same thing, and I understand that you and Judge McKeon were there as well. We had no idea that one of these court hearings would be in a movie. We had no reasonable expectation of privacy. Privacy, being in a public court. That's quite right. The public proceedings of this court are a matter of record. Thank you, Your Honor. May it please the Court, I'm Thomas Byron, as you know, from the Justice Department here on behalf of the government defendants. The district court in this case correctly dismissed the complaint and denied the request of injunction. Under governing Supreme Court precedent, Smith v. Maryland makes perfectly clear and has done for decades that, as plaintiff's counsel has acknowledged, the very kind of metadata that was at issue in that case is also at issue in this case. And this court's precedents under Smith, including Forrest and Reed, make clear that the additional metadata that's at issue, remember, this is non-content business records that reflect information about telephone communications, not the content of those communications themselves. That kind of metadata, as in Forrest, which was about Internet addressing IP addresses, as in Reed, which included trap and trace as well as pen register, all of that is acknowledged to be governed by Smith in this court's precedents. And, therefore, the district court correctly applied that rule. Except, and we'll go to Mr. Smith's argument, he would be with you all the way to the last point, probably, as, yes, the data itself could be collected. But here, unlike Smith, you have a very different scope and duration. And he says that changes the reasonableness calculus. Well, Your Honor, first of all, I don't think it's a reasonableness calculus. The question, the initial question decided by Smith, is whether there is a search at all for Fourth Amendment purposes. And how do you determine if there's a search? Whether there's a reasonable expectation of privacy. Okay, precisely. But that objective reasonableness test is an inquiry into the expectations that society will recognize, as the court said in Smith, repeating the holding of Katz. And that reasonableness inquiry, I meant to distinguish, Your Honor, from the reasonableness inquiry that would be the second step if there were a search, and that's where the special needs doctrine or King against Maryland and those kinds of reasonableness standards come into play. Not at this step. So I'd be happy to talk about that second step if you'd like. But that first step, the objective reasonableness. Of the expectation, Your Honor. Or the expectation, excuse me. Right. Whether there's a reasonable expectation of privacy. Sure. In X. And Smith said, well, no, there's not, if this data is accessed for this period of time. Well, Your Honor, actually Smith did not. And maybe Smith doesn't talk about the duration specifically. That's right. But the question is. Well, I think even implicitly, to be fair. Right. Okay. So the question is, then, Smith doesn't talk about the duration and quantity. Correct. But you still would have to determine whether you'd have to go to your test whether there's an objective expectation of privacy in this volume of data. Wouldn't you have to ask that question? I don't think so, Your Honor. The D.C. Circuit's decision in the Maynard case, which was later heard by the Supreme Court in Jones, right? It's the same case. The D.C. Circuit in Maynard expressly distinguished Smith from that GPS tracking case question that plaintiff's counsel was discussing. And expressly said that Smith was different. And, in fact, that a longer-term acquisition of metadata, called metadata, would be different because although one doesn't expect one's location to be made available to a third party over a long period of time, one does expect and must expect that the call information you provide to your telephone carrier will be made available to that carrier over the entire time you're using the carrier to facilitate your communications. That very basis is the reason why the additional duration and I'm not sure the duration is really relevant in any way under Smith, but to the extent it would be, why it doesn't change the analysis. Because there is an expectation that your telephone company will know everyone you call over the period. They must. They have to facilitate that communication. Then the next question I think that plaintiff raised in this context was whether the number of individuals' calls or call records whose metadata is at issue in the production records that the FISC has ordered might make a difference. And the answer to that, I think, plaintiff acknowledged, in fact, at argument today, is no. Because only plaintiff's own call records are at issue in this case or metadata about her own calls are at issue in this case. And, indeed, because Fourth Amendment rights are personal, one cannot invoke the Fourth Amendment rights of others, as Judge Collier's opinion for the FISC in March of this year made very clear in rejecting the kind of arguments that plaintiff has relied on here. And we provided the Court with that opinion in our addendum. With respect to Smith, it did come up in Riley, again, in the Court's opinion. Not very much. So it was a little bit elliptical. Riley, I mean, not Ryan. It's a little bit elliptical. There they're talking about call logs. And I guess in Riley the call logs revealed something more than just the number, that little house. Yes, exactly. Like, that's my house. Yes, Your Honor. That was very important, indeed. But that is my question, is what does Riley do, in your view, in terms of how it deals with Smith? Well, first of all, Your Honor, Riley itself was about that very different question after one established that there is a search. And the Court there made that clear in its first footnote, that distinguishing the question presented in that case where the parties had admitted or acknowledged there was a search and determination was whether it was reasonable and subject to the exception for a search incident to arrest. Distinguished in that footnote one, that question from the question in this case, which is whether there is a search at all under the Fourth Amendment where metadata is acquired. So from its theory is that by an individual popping open their cell phone and typing in a number and accessing Verizon, T-Mobile, whatever, that that's voluntarily giving up that information and therefore no expectation of privacy. Is that correct? Yes. And that was the Court's holding in Smith v. Maryland, Your Honor. Right. But I would also emphasize that in this case it's even clearer. Because Smith v. Maryland was just about the transmission of the called number to the telephone company to complete the call. And the interception was at the point from the defendant in that case, Smith's phone to the telephone company, although the pen register was installed on the telephone company's premises. Here it's even easier. What the FISC orders is the production by a telephone carrier of the call records, the business records of that company that it creates and maintains itself. So in addition to the third-party principle relied on by the Supreme Court in Smith, we also have this additional support, this additional reason why this is permissible under the Fourth Amendment because all of the many subpoena cases, grand jury subpoenas, administrative subpoenas, cases going back to 1946 with Oklahoma Press, this Court's precedent more recently in Golden Valley Electric, which make clear that a subpoena ordering the production of a company's business records in no way implicates the Fourth Amendment interests of that company's customers. So with the government's rationale, suppose the National Security Agency wanted access to all utility records nationwide. Would that rationale apply? Well, Judge Hawkins, I don't know. Start with a yes or no. I don't know, Your Honor, is the only answer I can give to that. And the reason I have to say that, and I cannot answer yes or no, is because, first of all, the Fourth Amendment inquiry is necessarily context-dependent. And therefore — Let's change the context. How about hotel-motel receipts? Well, Your Honor, I'm struggling now to remember the name of the case, but we cited it in our brief. This Court has held that the order to produce hotel records, an order directed to the hotel owner, is, like those other business records cases, not a search of the customers' Fourth Amendment interests. How about bank records? Well, Miller, in the Supreme Court, makes very clear that the bank records are, again, the records of the bank, just as the records here are the records of the carriers. Well, what about medical records? Well, medical records, Judge McKeon, I'm glad you asked that, because this is really an important point. Medical records would be subject to HIPAA, among other protections. But that doesn't mean that they might not — Congress could repeal HIPAA. And I realize there's rules with respect to utilities, banks, medical, et cetera. Leaving that aside, you could still have a Fourth Amendment. I mean, maybe that would be still unconstitutional. So is the fact that an individual went to a doctor, leaving aside what the diagnosis might be, in your view under the Smith Doctrine, would that mean that there would be no search if the government got that? I don't know. And I have to answer your question, unfortunately, the same way I answered Judge Hawkins, because of the context dependence of the Fourth Amendment inquiry. But I think the significance of HIPAA can't be discounted. Following Miller, Congress enacted the financial privacy protections by statute. Following Keith, the Congress — But I don't think it can't be, because you still have a Fourth Amendment inquiry if somebody — To be sure. Yeah, you could say, well, HIPAA isn't enough. I really — I don't think HIPAA really protects my privacy. I want to make a Fourth Amendment challenge to the fact the government now has this program. They can find out about the doctors, and they can find out, for example, if someone went to an abortion doctor. Well, Judge McKeon, again, I have to say, the Fourth Amendment context-dependent analysis would have to be undertaken, as you say. We don't disagree with that. It would be governed, of course, by the Supreme Court's precedents and this Court's precedents. But my point as — How would we determine the societal expectation? Well, the Supreme Court determined, as a matter of law that governs this case, that there is no expectation of privacy in the number you call that you transmit to your telephone company. That's now decided. It's a matter of law. It's an objective inquiry. So when one asks about the societal expectations and the reasonableness of those expectations, I agree it's a very difficult inquiry. Commentators and courts have struggled with it in many different contexts over the years. It is necessarily difficult. Now, I think in this case, there is no need to struggle, because Smith decided it, and this Court has applied Smith in very clearly related analogous contexts. What about — there's some of the data here that has not actually been decided by a court. For example, the trunk identifier information. I disagree. Would you — okay, maybe that's been decided. It's not in the Ninth Circuit. Well, I think it is not meaningfully different from the Forrest case, which decided IP addressing and routing. IP addressing. That is very similar in the computer context to the telephone information here. I don't recall, but I think there may have been a case that we cited in our brief that — I just don't recall, Your Honor. I'm sorry. I'd have to provide that later if there were another court. Could you explain the trunk identifier information? I know the government takes a position that this is not location revealing. Exactly. But would you explain it? Well, and let me be clear about two things. First of all, we acknowledge and the declarations in the record that the government provided explain that trunk identifier information reveals at a very broad level where a connection is made in the routing of a phone call. But the plaintiff's expert, Mr. Felton, makes the point that that can be revealing of some location information, such as I think the example is whether a call goes from the islands of Hawaii to the mainland. Hawaii to the mainland. So I would point out two things. First of all, plaintiff has expressly disavowed in her brief. I think it's footnote five, but I might be misremembering. It's one of those footnotes. Expressly disavowed any reliance on a location-based argument that has been raised in some of the other cases. Secondly, that the kind of very general location information about where a call is routed, in other words, where a connection is made by a telephone company to complete a call, is not the kind of thing that would allow the tracking of an individual's location that some of those other cases have invoked or involved. Well, I mean, it is kind of in the old days when people did use landlines. Right. They were connected to- To a very specific address. Okay. Absolutely, Your Honor. Not so true anymore. That's right. So I would like to go back, Judge McKeon, to your point about HIPAA because it's also the point about FISA, or my point about HIPAA in response to your question is also the point about FISA. In response to Miller, the Congress enacted a bank records protection of privacy. In response to Keith, the Congress enacted FISA. FISA itself is the source, as amended, for the FISC orders that authorize and supervise the program that's at issue in this case. The Fourth Amendment, as Professor Oren Kerr, in the article that we cited in our brief, makes clear, shouldn't be expected to do all of the privacy-protecting work. It's a- I think Professor Kerr refers to it as a blunt instrument because it is necessarily going to exclude everything that, by virtue of the exclusionary rule, exclude anything that was collected in violation of the Constitution in subsequent criminal proceedings. And so Professor Kerr makes the point that Congress has a role to play in protecting privacy, and so do the courts. And in this case, Congress, the FISC, the Article III court, and the executive branch have all operated together to ensure the protection of privacy under this program of privacy. So are you saying that in determining what is an objective expectation of privacy, that the fact that the FISC orders require this reasonable suspicion for the second line inquiry is part of why there's no reasonable expectation for the first line collection? I think that's right, Your Honor. In other words, this context-dependent inquiry that the Fourth Amendment requires cannot be so clearly differentiated- I'm sorry, requires that the analysis here not so starkly differentiate the collection from the ultimate use that's contemplated by the Section 215 program under the FISC's orders. In other words, one of the points that we made both in the standing context and on the merits- and I would reiterate, I think, Judge Tallman, your questions, and Judge McHenry's as well- emphasized that the plaintiff has serious problems on standing. And if I could divert for just a moment to make the point you'd asked about whether this motion to dismiss was transformed to a summary judgment motion, the answer is no, but because the government objected to the plaintiff's standing, which is a jurisdictional objection under Rule 12b-1, and provided a factual basis- the Shea Declaration and the Jekyll and Hyde Declaration from the FBI- for challenging plaintiff's standing, it was then incumbent on that factual dispute about standing for plaintiff to come forward with evidence, not merely allegations, and plaintiff provided no contrary evidence. Therefore, that factual question under 12b-1 was properly before the court. What if we determined hypothetically that she does have standing? May we look at those declarations to determine this objective reasonable expectation so that we have the NSA's description and we have her expert's description? I think that's a potentially difficult question, Judge McHenry, and I think the answer- That's why I asked you. But I think the answer depends- And you. On a couple of first steps. So obviously the court can't assume jurisdiction, as Steele Company makes clear, in the starkest sense. But what you could do, presumably, is recognize that some of the standing objections, although some are not, some of them are interrelated with the merits. And in that sense, as we acknowledge in our brief, some of those questions that do go to that second step necessarily turn on some of these factual questions about the merits, and that happens in lots of standing inquiries, right? Now, it's not clear that the question about Verizon Wireless and whether it has ever been subject to a production order by the FISC is such a question, and I'd just flag that for a moment as the real difficulty, I think, as the Shea Declaration- But those declarations don't answer that question. Well, the Shea Declaration makes clear that the identity of carriers, and I think this is at Supplemental Excerpt of Record, page 9, that the identity of the carriers remains classified, with the sole exception of VB&S in the 90-day period in 2013. And that was only because it was leaked by Snowden. Well, actually, it's only because it was acknowledged following the leak, right? But other than that, they do remain classified. That was the point we made in objecting on jurisdictional grounds to standing- I see my time's expired, but I'll finish answering the question, Your Honor. Yeah, please finish. That was the reason for the factual challenge, to make the point that the plaintiff could not show on the public record, and, of course, the plaintiff here has chosen to proceed on the public record. Now, I think the answer, Judge McKeon, to your question about can you look at certain factual questions in order to understand the program in the way that the government unclassified, declassified information identifies and describes it, I think the answer is you can, and you don't necessarily need to look at the declarations, and the record to do so. We have also cited and relied on, and the plaintiffs have as well, many of the public documents of both the FISC, the Director of National Intelligence, the Director of the NSA, and the President. Much of which mirrors what's in that declaration. Exactly right, Your Honor, and that's the main point. The white paper is a public declaration that the court could look to that describes this in great detail, as do, of course, all of the FISC orders that authorize the program and then supervise it as well. The court has no questions about that second step of the inquiry, that reasonableness, if it were a search. I would just like to note that the special needs cases make clear that we think this would clearly be reasonable under the Fourth Amendment standard for searches that must then be reasonable even if not authorized by a warrant. Thank you. Otherwise, we urge you to affirm. Thank you. I'll give you two minutes. We used up your time. We also used up a lot of the government time. So you have two minutes for rebuttal. Thank you, Your Honor. First, the government says something very key to this case, and that this case is context dependent. In other words, we have to look at this program for what it is, and that's the dragnet collection of call records over time and storage of those call records, which reveals private information about U.S. citizens, including Anna. Second, I would like to hit the point that if this is not a search, then the next logical step to that is the government could copy enormous amounts of data, including e-mails. They could record phone conversations. They could track movements. They already know that they can do that under Ninth Circuit and other circuit law in terms of IP addresses, routing to and from different IP addresses. But certainly not in this context where they're tracking it for every single day for years on end, into perpetuity, essentially, and then storing that data at some point, using it for whatever investigation they want to make. So I think the context is very important here. On those particular cases, again, we had an individual criminal defendant who was surveilled for a limited period of time for a purpose. In this case, we've got an innocent American whose all her records are being swept up in this program, and I think the context of that is very different. In fact, it's something I don't think any court has ever faced in this country, is that where the government is surveilling its citizens on this grand of a scale, and I don't think it's ever been possible until now. And so that makes it very, very different, and I think the context of this search. What's your response to the special needs argument for that second problem? Yeah, the first step is whether it's impractical for the government to obtain a warrant, and it's not. In 2012, the government did. Well, that assumes that the government can otherwise establish probable cause that the records of Ms. Smith would be relevant to a espionage or counterterrorism investigation, would it not? It would require the reasonable articulable suspicion under the test. No, no, no. You're asking us to declare that the government would have to show probable cause if it's a search. Correct. Under either standard, they can't show that about Ms. Smith, but they could certainly, if they had a seed that they wanted to search and see who that person made contact with, it's practical for them to go to a court and get an order. But don't they do that under the second stage now? They go back to the FISC and they say, these are the inquiries we want to make? They do purportedly do that, but it's after they've already collected all the data. They're not going to the phone company and saying, we have a seed that we believe is connected to terrorism, and we want you to pull the numbers that that person's been dialing, who's dialed them, and do the hops analysis in that respect. So would it be okay for the government to do that at the second stage if they hadn't collected the data in the first place? In other words, as long as they went to the FISC and obtained the order, could they then run a search of all the carrier records in the custody of the carriers? I think in the context of Anna, it would not. They would require probable cause to do that search for her. So you are asking us to, A, to declare that the collection is a search and that it requires probable cause? Correct. Okay. So the collection meaning the metadata that the phone company gives to the government requires probable cause? I would say yes. If you want to get that data about a U.S. citizen and your position. Regardless of whose custody the data is in. Correct. All right. Thank you. Thank you, Your Honor. The case just argued, Smith v. Obama, is submitted. I do want to thank both counsel for a very helpful briefing on both sides and argument as well. The case is submitted and we'll next hear argument in United States v. Leeming.
judges: Hawkins, McKeown, Tallman